**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **WILLIAM JACKSON**, | **CIVIL ACTION** |
| Plaintiff, | |
| *v.* | **NO. 20-1421-KSM** |
| **TEMPLE UNIVERSITY,** | |
| Defendant. | |

<u>**MEMORANDUM**</u>

Marston, J.                                                           **January 25, 2023**

Plaintiff William Jackson brings claims for age and disability discrimination against his

former employer, Defendant Temple University.  (Doc. No. 1.)  Temple has moved for summary

judgment on all counts.  (Doc. No. 37.)  For the reasons discussed below, that motion is granted.

## I.    FACTUAL BACKGROUND

Viewing the evidence in the light most favorable to Jackson, the relevant facts are as

follows.

### A.    *Jackson Is Injured at Work.*

Jackson is a 64-year-old, white male.  (D. Ex. 1 at 10:21–22.)  Temple University hired

Jackson in 2016 in the position of Roving Engineer II.  (Doc. No. 43 at ¶ 6; *see also id.* at ¶¶ 4–5

(explaining that Jackson worked for Temple affiliates from 2004 to 2016).)  In that role, Jackson

was responsible for inspecting and performing maintenance at buildings across Temple's

campus, and he was required to climb ladders, work at heights, and do other tasks that required

"lifting, climbing, . . . and bending."  (*Id.* at ¶¶ 7–8; *see also* Doc. No. 40 at ¶ 2.)

On January 6, 2018, Jackson was working on a wooden ladder when the rungs of the

ladder broke, causing him to fall through the rungs, directly onto his knees.  (Doc. No. 40 at ¶ 4; Doc. No. 43 at ¶ 10; *see also* D. Ex. 1 at 23:3–17.)  Jackson reported to the University's Employee Health Services for a medical exam with Dr. Ben Hur Mobo.  (Doc. No. 40 at ¶ 5.) Dr. Mobo found that the knee injury left Jackson unable to perform his job duties and completed a worker's compensation patient evaluation report and work release status form.  (*Id.*; *see also* D. Ex. 4 at TEMPLE001524–26.)

Jackson received workers' compensation benefits from January 2018 until late July 2018. (Doc. No. 40 at ¶ 6; *see also* D. Ex. 3 (Workers' Compensation Incident Report))  During that time, Dr. Mobo periodically examined Jackson and confirmed that he remained unable to return to full-duty work.  (Doc. No. 40 at ¶ 6.)  On July 24, 2018, Dr. Mobo conducted another examination, this time considering an MRI of Jackson's knees.  (*Id.* at ¶ 7.)  Dr. Mobo noted that "there is no active knee pathology noted on MRI and recent exams," and "[f]rom this perspective," Jackson was ready to "return[ ] to full duty."  (*See* D. Ex. 4 at TEMPLE001527– 30.)

**B.      *Jackson Disputes His Ability to Return to Work.***

On July 25, 2018, Temple's workers' compensation administrator notified Jackson and Thomas Johnston, Temple's Director of Workers' Compensation and Absence Management, that Jackson had been cleared to return to work.  (*See* D. Ex. 6.)  And on August 15, Johnston wrote to Jackson that if he wished to return to his Roving Engineer II position, he should report for work on August 22.  (*See* D. Ex. 7.)

On August 16, however, Jackson's personal chiropractor, Glen Nathan, sent a fax to Temple, stating that Jackson's "return date remains unknown as he remains in treatment for the injuries sustained."  (Doc. No. 40 at ¶ 11; *see also* D. Ex. 8 at TEMPLE000684.)  Jackson did not return to work on August 22.  (Doc. No. 40 at ¶ 12.)  He remained out of work and continued

to collect workers' compensation benefits.  (*Id.*)

On September 5, an administrative specialist with Temple's Benefits Department sent Jackson a letter requesting medical documentation to support his continued absence.  (Doc. No. 40 at ¶ 13; *see also* D. Ex. 10.)  That same day, Johnston sent Jackson a separate letter warning that if he failed to submit the paperwork to support his continued absence, then his status would change to "absent without leave" and could result in discipline under Temple's Rules of Conduct.  (Doc. No. 40 at ¶ 13; *see also* D. Ex. 11.)  A few days later, Jackson submitted a Leave of Absence Request Form, a Fitness for Duty Certification, and a Medical Documentation Form completed by Mr. Nathan.  (Doc. No. 40 at ¶ 14; *see also* D. Exs. 12–14.)  The documents requested a leave of absence beginning August 22, 2018, and again indicated that the end date for leave was "unknown."  (Doc. No. 40 at ¶ 14; *see also* D. Ex. 1 at 48:2–16; D. Ex. 8.)

On October 29, Dr. Dennis P. McHugh performed an independent medical examination ("IME") of Jackson and concluded that he was fully recovered from the injuries he sustained in January 2018:

> It is my medical opinion, within a reasonable degree of medical certainty, that Mr. Jackson sustained an abrasion to his right knee and bilateral knee contusions on January 6, 2018 . . . , that he is fully recovered from these injuries . . . , that no further care is needed, and he could return to work immediately full duty without restrictions.

(D. Ex. 15 at TEMPLE001541–48; *see also* D. Ex. 1 at 41:3–6 (agreeing that Dr. McHugh opined that Jackson was "fully recovered and able to return to full duty").)  Dr. McHugh prepared a Notice of Ability to Return to Work and Affidavit of Recovery, which were given to Jackson and Johnston on November 6.  (D. Ex. 16 at TEMPLE 001549–51.)

Two days later, Johnston sent another letter to Jackson, advising him that he could return to his Roving Engineer II position beginning November 14.  (D. Ex. 17.)  The letter warned that failure to report would be considered a refusal of Temple's offer to return to the position, which

could jeopardize Jackson's benefits and his relationship with the school.  (*Id.*)  Jackson did not

report for work on November 14, and instead, contacted Johnston to request a continued leave of

absence in accordance with the paperwork that he had previously submitted.  (Doc. No. 40 at

¶ 20.)  On November 16, Jackson's employment was terminated for violation of Temple's Rules

of Conduct, specifically the provision categorizing "any unapproved work absence of 3

consecutive days" as a Category D violation, for which termination is mandatory.  (D. Ex. 20

(Termination letter from Johnston to Jackson); *see also* D. Ex. 18 at TEMPLE000027.)

     **C.**     ***Jackson Applies for a Position as Steam Plant Engineer.***

     Eleven days after being terminated, Jackson called Johnston to discuss an open position

for Steam Plant Engineer on November 27, 2018.  (D. Ex. 22 at TEMPLE 001803.)  Like the

Roving Engineer II position, the Steam Plant Engineer position required a certain level of

education and experience, a valid engineer license, and that the applicant be able "to perform

tasks that require lifting, climbing, working at heights, and bending.  (*Compare* D. Ex. 24

(Temple Steam Plant Engineer Job Description), *with* Doc. No. 40-4 (Temple Stationary

Engineer Job Description), *and* Doc. No. 43 at ¶ 7 (Jackson conceding that "the Stationary

Engineer position . . . has essentially the same job functions and responsibilities as the Roving

Engineer II position").)  But unlike Roving Engineers, who cover multiple buildings across

Temple's main campus, Steam Plant Engineers work only in the steam plant.  (D. Ex. 21 at

54:13–17.)

     Jackson had previously applied for the Steam Plant Engineer position in September 2017,

but at the time, the position was given to a different candidate.  (Doc. No. 43 at ¶ 9.)  Jackson

argues that he was "more qualified" than the other candidate.  (Doc. No. 40 at ¶ 3.)  However,

the interviewers' notes show that the two men were "equally qualified," but the other candidate

had "electronics, cogeneration and pharmaceutical experience" that Jackson lacked.  (Doc. No.

43 at ¶ 9; *see also* Doc. No. 40-5 (Interview Notes) at TEMPLE001584–586.)

During their conversation in November 2018, Johnston told Jackson that he was free to apply for the steam plant position but he would be considered an external applicant because he had been terminated.[1]  (D. Ex. 21 at 57:13–58:8.)  After this conversation, Johnston alerted Jackson's former supervisor, Sean Ounan, that Jackson was interested in applying for the Steam Plant Engineer position and believed he could perform the primary functions of the job.  (Doc. No. 40-15 at 2 (Nov. 27, 2018 email from Johnston to Ounan).)  Ounan responded, "The short answer is absolutely not" (*id.*), and told Johnston that Jackson was not qualified to work in the steam plant.

On November 28, Jackson submitted a late bid for the Steam Plant Engineer position.  (*See* D. Ex. 23; *see also* D. Ex. 25 at TEMPLE001947 (indicating that Jackson's bid was considered late).)  He was one of 22 applicants.  (D. Ex. 25 at TEMPLE001947–48.)

In January 2019, Temple hired a man named Brandon Faison for the Steam Plant Engineer position.  At the time, Faison was "half [Jackson's] age."  And in February 2019, Temple hired Michael Coghlan to assume responsibility for Jackson's Roving Engineer II duties.  (Doc. No. 40 at ¶ 31.)  Cochlan was 40 years old at the time.  (D. Ex. 26 at 4.)

### D.     *Jackson and Temple Settle Workers' Compensation Dispute.*

Meanwhile, Jackson and Temple continued to dispute Jackson's entitlement to workers' compensation.

On June 19, 2019, Jackson and Temple entered into a Compromise and Release Agreement (the "Release"), along with a separate Agreement Not to Seek Re-Employment (the

---

[1] The record suggests that Jackson was actually considered an internal applicant (*see* D. Ex. 25 at TEMPLE001947), but this fact is not material to the issues before the Court.

"ANSR") in connection with workers' compensation proceedings that Jackson had initiated

against Temple.  (D. Exs. 27, 28.)  Under the Release, Temple agreed to pay Jackson

$155,000.00 to "resolve[ ] all future claims and issues arising out of [the January 6, 2018] injury

and [to] forever end[ ] entitlement to any and all future benefits for this injury."  (D. Ex. 27.)

And under the ANSR, Jackson further agreed "not to seek reemployment with Temple

University" or its affiliates and "expressly release[d] Temple University from any and all

liability from any other claims or potential claims including but not limited to age

discrimination."  (D. Ex. 28.)

Jackson was represented by counsel during negotiations and execution of the Release and

ANSR.  (Doc. No. 40 at ¶ 38.)  And on June 19, 2019, he testified under oath before Workers'

Compensation Judge Bonnie Callahan that he had reviewed the Release with counsel "paragraph

by paragraph" and was voluntarily agreeing to it.  (*See* D. Ex. 30 at 10:11–17:11; *see also* Doc.

No. 40 at ¶ 39.)  That same day, Judge Callahan issued a bench order approving the agreements.

(D. Ex. 31; *see also* Doc. No. 40 at ¶ 40.)

## II.    PROCEDURAL HISTORY

Jackson dual filed a charge of discrimination with the Equal Employment Opportunity

Commission ("EEOC") and Pennsylvania Human Relations Commission ("PHRC").  (Doc. No.

15 at ¶¶ 62, 67.)  The EEOC issued a Dismissal and Notice of Rights on December 17, 2019 (*id.*

at ¶ 63 & p. 14), and Jackson filed his Complaint in this case on March 13, 2020 (*see id.*).  He

brings claims for age discrimination under the Pennsylvania Human Relations Action ("PHRA")

(Count I) and the Age Discrimination in Employment Act ("ADEA") (Count II), a claim for

disability discrimination under the Americans with Disability Act ("ADA") (Count III), and

claims for retaliation under Title VII of the Civil Rights Act of 1964[2] (Count IV), the PHRA (Count V), the ADA (Count VI), and the Philadelphia Fair Practices Ordinance ("PFPO") (Count VII).  (*See generally id.*)

Temple moved to dismiss the Complaint in its entirety (*see* Doc. No. 3), and the Court agreed that dismissal was appropriate to the extent Jackson's retaliation claims were premised on a failure to accommodate[3] (*see* Doc. No. 14).  The Court also dismissed Jackson's age discrimination claim with leave to amend.  (*Id.*)  Jackson filed an Amended Complaint, which cured the defects identified by the Court.  (Doc. No. 15; *see also* Doc. No. 27 at 1 n.2 (finding Plaintiff plausibly alleged age discrimination under new Third Circuit precedent).)  And the parties proceeded to discovery.

Temple University now moves for summary judgment on all counts of the Amended Complaint.  (Doc. No. 37.)  Jackson opposes the motion.  (Doc. No. 39.)  For the reasons discussed below, the motion is granted.

## III.    LEGAL STANDARD

Summary judgment is appropriate when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  "[T]he mere existence of *some* alleged factual dispute between the

---

[2] The Court previously dismissed Jackson's Title VII claim because he failed to respond to Temple's argument that the Complaint lacked any allegations of "conduct that could be viewed as actionable under Title VII."  (Doc. No. 13 at 11 n.3.)  Jackson raised an identical Title VII claim in his Amended Complaint, and Temple now moves for summary judgment on the grounds that Jackson once again failed to allege conduct that violates Title VII or to put forth any evidence to support such a claim.  Jackson failed to respond to this argument, and thus, summary judgment is entered as to Temple on Count IV.

[3] The failure to accommodate claim was properly characterized as disability discrimination, not retaliation, and thus, was already encompassed by Jackson's claim of ADA discrimination.

parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48 (1986).

"[A] party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quotation marks omitted); *see also id.* at 325 ("[T]he burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case."). After the moving party has met its burden, the nonmoving party is required to "designate specific facts showing that there is a genuine issue for trial." *Id.* at 323 (quotation marks omitted); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) ("When the moving party has carried its burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." (footnote omitted)).

"[T]his standard makes clear that, even though the right to a jury trial is implicated, a nonmoving party must adduce more than a mere scintilla of evidence in its favor, and cannot simply reassert factually unsupported allegations contained in its pleadings." *Williams v. Borough of West Chester*, 891 F.2d 458, 460 (3d Cir. 1989) (internal citations omitted). "[U]nsupported assertions, conclusory allegations or mere suspicions" are insufficient to overcome a motion for summary judgment. *Schaar v. Lehigh Valley Health Servs., Inc.*, 732 F. Supp. 2d 490, 493 (E.D. Pa. 2010).

## IV. DISCUSSION

Temple argues that Jackson released the majority of his employment claims when he

signed the Release and the ANSR.  In the alternative, it argues that Jackson has failed to put forth evidence to support the essential elements of his discrimination and retaliation claims.  The Court addresses each argument in turn.

### A.    *Jackson Released All Claims Except His ADEA Claim.*

First, Temple argues that all of Jackson's claims, except his claim under the ADEA, fall within the scope of the Release and ANSR, and accordingly, Jackson cannot raise them here. (*See* Doc. No. 37 at 11–13; *see also id.* at 13 n.49 (conceding that the Release "does not fulfill all requirements under the Older Workers Benefit Protection Act," a necessary precondition for release of age-based claims under the ADEA).)

"Employees may waive employment claims against their employer so long as the waiver is made 'knowingly and willfully.'"  *Cuchara v. Gai-Tronics Corp.*, 129 F. App'x 728, 730 (3d Cir. 2005) (quoting *Coventry v. U.S. Steel Corp.*, 856 F.2d 514, 522 (3d Cir. 1988)).  To determine whether a waiver is knowing and voluntary, the court considers the "totality of the circumstances," including:

> (1) the clarity and specificity of the release language; (2) the plaintiff's education and business experience; (3) the amount of time plaintiff had for deliberation about the release before signing it; (4) whether Plaintiff knew or should have known his rights upon execution of the release; (5) whether plaintiff was encouraged to seek, or in fact received benefit of counsel; (6) whether there was an opportunity for negotiation of the terms of the Agreement; and (7) whether the consideration given in exchange for the waiver and accepted by the employee exceeds the benefits to which the employee was already entitled by contract or law.

*Cirillo v. Arco Chem. Co.*, 862 F.2d 448, 451 (3d Cir. 1988) (citing *Coventry*, 856, F.2d at 523), *superseded by statute as stated in Long v. Sears Roebuck & Co.*, 105 F.3d 1529, 1539 (3d Cir. 1997) (holding that the Older Workers Benefit Protection Act supersedes *Cirillo* with respect to release of ADEA claims); *see also Geraghty v. Ins. Servs. Office, Inc.*, 369 F. App'x 402, 405

(3d Cir. 2010) (same); *Miller v. Tyco Elecs., Ltd.*, No. 1:10-cv-2479, 2011 WL 5878338, at *3 (M.D. Pa. Nov. 23, 2011) (same).  In addition to these factors, courts also consider "whether there is evidence of fraud or undue influence, or whether enforcement of the agreement would be against the public interest."  *Cuchara v. Gai-Tronics Corp.*, 129 F. App'x 728, 731 (3d Cir. 2005).

Jackson does not dispute that the plain language of the Release, which "resolves all future claims and issues arising out of this injury" (Doc. No. 27 at TEMPLE00360), and the plaint language of the ANSR, which resolves "any and all liability from any other claims or potential claims" (Doc. No. 28), encompasses the employment claims asserted here.  *Contra Canfield v. Movie Tavern Inc.*, Civil Action No. 13-cv-03484, 2013 WL 6506320, at * (E.D. Pa. Dec. 12, 2013) (not reaching knowing and voluntary analysis because the parties' compromise and release agreement "clearly indicates that Plaintiff released Defendant's liability only for Plaintiff's workers' compensation claim").  Neither does Jackson challenge the validity of the agreements, which were approved by Judge Callahan.  *See Hoggard v. Catch, Inc.*, Civil Action No. 12-4783, 2013 WL 3430885, at *4 (E.D. Pa. July 9, 2013) ("The [compromise and release agreement] between Plaintiff and Defendant is a valid contract between the parties that is final and binding because [it] has been approved by the workers' compensation judge."); *Flynn v. Fed. Express*, Civil Action No. 07-2455, 2008 WL 2188549, at *2 (E.D. Pa. May 23, 2008) ("A valid compromise and release agreement approved by a workers' compensation judge is final, conclusive, and binding.").  Instead, Jackson argues that he did not knowingly and voluntarily waive his employment discrimination claims when he entered the Release and ANSR.

### 1.   **Jackson's Affidavit**

To support his argument, Jackson relies on an affidavit that he submitted with his opposition brief, in which he attests:  (1) "I would not have agreed to execute the Release if I

understood [my employment law claims] were being released"; and (2) "At no point was it explained to me that I would be agreeing to release Defendant from liability related to the claims brought in this action." (Doc. No. 40-18 at ¶¶ 7–8.) Temple argues that the Court should disregard the affidavit because it is "self-serving and conclusory."

"It is true that 'conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment.'" *Kirleis v. Dickie, McCarney & Chilcote, P.C.*, 560 F.3d 156, 161 (3d Cir. 2009) (quoting *Blair v. Scott Spec. Gases*, 283 F.3d 595, 608 (3d Cir. 2002)); *see also Paladino v. Newsome*, 885 F.3d 203, 208 (3d Cir. 2018) (same); *Samuel v. Target Realty, LLC*, Civ. A. No. 19-2203, 2021 WL 4774858, at *9 n.8 (E.D. Pa. Oct. 13, 2021) ("In connection with a motion for summary judgment, 'the affiant must ordinarily set forth facts, rather than opinions or conclusions. An affidavit that is essentially conclusory and lacking in specific facts is inadequate to satisfy the movant's burden.'" (quoting *Maldonado v. Ramirez*, 757 F.2d 48, 51 (3d Cir. 1985))). But here, Jackson attests to specific facts about what was explained to him at the time he signed the agreements and what claims he believed he was waiving. In other words, Jackson's affidavit attests, at least in part, to specific facts, not unsupported conclusions. *See Kirleis*, 560 F.3d at 161 ("Far from a conclusory statement that she never agreed to arbitrate, Kirleis details the specific circumstances that rendered the formation of an agreement to arbitrate impossible."). *Contra. Paladino*, 885 F.3d at 208 (disregarding the plaintiff's affidavit where he "vaguely claimed—without providing any specifics—that the Prison's records were 'incomplete' and that Prison employees purposefully interfered with his forms").

Nevertheless, Jackson's affidavit is not dispositive on the issue of voluntariness, and the Court considers the non-conclusory statements in Jackson's affidavit as one piece of evidence in its analysis of the *Coventry* factors. *See Coventry*, 856 F.2d at 522–23 (requiring the court to

11

consider the "totality of the circumstances"); *cf. Cottrell v. Club Demonstration Servs.*, Civil No. 06-14763, 2007 WL 2413070, at *3 (E.D. Mich. Aug. 2, 2007) (explaining that the plaintiff put forth "an affidavit indicating that she was not given time to review th[e arbitration] agreement and was not permitted to consult with a lawyer regarding it. Defendants respond that this is merely a self-serving affidavit that should be dismissed . . . . If the only factor in this inquiry was the time a party was given before signing the agreement then it is possible I would find it appropriate to hold trial on this fact, but in light of the other factors . . . I find there is no dispute of material fact that this agreement is a knowing and voluntary waiver of [the plaintiff's] right to a trial by jury."); *Mitchell v. Diallo*, No. 8:19-CV-570, 2020 WL 8261584, at *6 (D. Neb. Oct. 19, 2020) (considering the plaintiff's affidavit attesting that "he 'was required' to sign the release" to receive workers compensation benefits and finding that the affidavit "does no refute the evidence the remaining Werner Defendants submit in support of summary judgment, including that [the plaintiff] was represented by an attorney during the negotiation and signing of the release, that the agreement provided [the plaintiff] with three weeks to review the terms of the release before signing it, and that the release itself states the [the plaintiff] entered into the contract voluntary [sic] and was not coerced" (internal citations omitted)).

## 2. The *Coventry* Factors

Even considering Jackson's affidavit, a review of the *Coventry* factors shows that he knowingly and voluntarily waived the ADA and state law discrimination claims that he brings in his Amended Complaint.

The first factor, which considers the clarity and specificity of the contract language, weighs strongly in favor of a finding that Jackson released the employment claims at issue. Notably, the Release states that it "resolves all future claims and issues arising out of this injury and forever ends entitlement to any and all future benefits for this injury." (D. Ex. 27 at

12

TEMPLE000360; *see also id.* ("The parties wish to prevent any and all future litigation surrounding this work injury.").)  Jackson's claims for disability discrimination clearly "aris[e] out of" his January 6, 2018 injury.  *See Hoggard*, 2013 WL 3430885, at *3 (highlighting language in the parties' compromise and release agreement that it "'completely resolves all claims and issues arising out of Claimant's 05/11/2011 injury'" and finding "[t]he clarity and specificity of the [release] weighs strongly in favor of finding that Plaintiff did knowingly and voluntarily waive his right to file suit on the claims he made in his Complaint" (quoting agreement)); *cf. Wisecup v. Aichi Forge USA, Inc.*, Civil Case No. 17-cv-07-JMH, 2018 WL 1701318, at *5 (D. Ky. April 6, 2018) (considering *Hoggard* and *Canfield* and noting that "'[a]rising out of' has been interpreted to include all claims, including related employment claims, predicated on the subject of that phrase and is equivalent to 'originating from,' 'growing out of,' 'flowing from,' or 'done in connection with'").

The ANSR uses even broader language, stating that "as further consideration for the sums of money and/or other valuable benefits [Jackson] is to receive under, and by virtue of the" Release, Jackson "hereby expressly release[s] Temple University from any and all liability from any other claims including but not limited to age discrimination."  (D. Ex. 28.)  The phrase "any and all liability" encompasses all of the employment claims asserted by Jackson in this action, a conclusion that is reinforced by the specific reference to claims for "age discrimination."  *See Flynn*, 2008 WL 2188549, at *3 ("The provision releasing Federal Express from 'all past, present, and future liability' covers [the plaintiff's] PHRA and state wrongful termination in violation of public policy claims.").  *Contra Zuber v. Boscov's*, 871 F.3d 255, 259 (3d Cir. 2017) (emphasizing that the release was explicitly limited to "the alleged 8/12/2015 work injury claim as well as any other work injury claims" which meant the release "only prevent[s the plaintiff]

from seeking benefits and monies from a work injury claim.").

In short, the agreements were meant to broadly release and finally resolve all claims that Jackson had against Temple. And neither the terms of the Release nor the terms of the ANSR are subject to multiple interpretations. *Contra Miller*, 2011 WL 5878338, at *4 (holding that a handwritten provision added to the end of the parties' release agreement, which said, "the general release 'shall not apply to the currently active Pennsylvania Human Relations Commission docketed at PHRC Case # 200804540'" was "certainly not clear" because the drafter "omitted a noun after 'Pennsylvania Human Relations Commission' and before 'docketed.' If the omitted noun was 'claims,' then Plaintiffs claims arising out of the facts that form the basis of the PHRC complaint would be preserved. If the omitted word was 'investigation,' then Plaintiff would have waived her right to bring the instant action"). The first factor weighs strongly in favor of a finding that Jackson released the majority of his claims.

The second factor likewise weighs in favor of a finding that Jackson knowingly and voluntarily released his ADA and state law discrimination claims. Although Jackson is not an attorney, he graduated from high school, has some college education, and multiple professional certifications and licenses. (Doc. No. 43 at ¶¶ 2–3; *see also* D. Ex. 1 at 12:10–14:18 (testifying that he graduated high school, attended Pennsylvania State University for a year and a half, attended three trade schools, and has multiple certifications from the City of Philadelphia).) During the hearing before Judge Callahan, Jackson also confirmed that "he "read[s] and write[s] the English language," and he has put forth no evidence that he was unable to understand the clear language of the Release and ANSR. (D. Ex. 30 at 11:10–12.) In short, his "education and experience meet the minimal threshold to knowingly and voluntarily sign a waiver." *Miller*, 2011 WL 5878338, at *4 ("Plaintiff has a high school education and has several years of work

experience as a production specialist in data entry," and therefore, her "education and experience meet the minimal threshold to knowingly and voluntarily sign a waiver."); *see also Cuchara*, 129 F. App'x at 731 ("Although [the plaintiff] is not an attorney, he is an educated professional and there is no evidence that he was unable to comprehend the language of the Release or the implication of waiving his claims.").

The third, fifth, and sixth *Coventry* factors likewise weigh in favor of a finding that Jackson knowingly and voluntarily released his employment claims. Jackson was represented by an attorney during negotiation and deliberation of the Release and ANSR. (*See* D. Ex. 29 (Jackson's certification that he was "represented by an attorney of [his] own choosing" during the workers' compensation proceeding and that attorney explained the content of the Release); D. Ex. 30 at 14:14–25 (Jackson confirming that the initials on the certification are his own); *see also* D. Ex. 28 ("I hereby state that I have consulted an attorney prior to signing this [ANSR] and that such attorney has explained the legal effect of the same. I have read this agreement not to seek reemployment and understand its contents.").) During the hearing before Judge Callahan, he testified that he had "days" to review and read the Release, which was the culmination of a mediation between the parties; that he was able to "read [it] at [his] own pace and to ask [his attorney] any questions" about it; and that he and his attorney went through the Release "paragraph by paragraph." (D. Ex. 30 at 11:4–12:8.) *See Hoggard*, 2013 WL 3430885, at *5 ("The fifth and sixth factors weigh in favor of a finding that Plaintiff knowingly and voluntarily signed the [release agreement]. Plaintiff was represented by counsel. It appears the terms of the [compromise and release agreement] were a result of negotiations between Defendant, Plaintiff, and Plaintiff's attorney."). *Contra Coventry*, 856 F.2d at 524 (finding that the plaintiff was given the choice between "a lay-off of uncertain duration that would bring the certain cessation of his

income, and an early retirement plan that would make pension benefits available to him only if he agreed to forego his rights under the ADEA," circumstances which "illustrate that [the plaintiff's] decision to sign the release was not the result of negotiation between him and his employer and, further, that [the plaintiff] was placed in precisely the 'take it or leave it' predicament that supports a finding that his decision was not knowingly and willfully made").

The fourth factor weighs slightly in favor of a finding that Jackson knowingly and voluntarily released his employment claims.  Jackson attests in his affidavit that he was never told the Release and ANSR included the employment claims at issue here, but Jackson did not need to be told that the agreements encompassed those claims as it is clear on the face of the agreements that they forbid Jackson from bringing discrimination claims against Temple.  *See Hoggard*, 2013 WL 3430885, at *5 (explaining that because the release was "clear and specific, . . . it is arguable that Plaintiff should have known his rights upon execution").  Indeed, the ANSR goes so far as to state Jackson releases Temple from "any and all liability from any other claims or potential claims including but not limited to *age discrimination*."  (D. Ex. 28 (emphasis added).)  Jackson confirmed that he independently "read this agreement . . . and underst[oo]d its contents."  (*Id.*)  Thus, even viewing the evidence in the light most favorable to Jackson, the Court finds that he certainly should have known that he was releasing his discrimination claims against Temple.  *Contra Miller*, 2011 WL 5878338, at *4 ("[A]s to the fourth factor, Plaintiff argues that she 'did not know that Tyco would now be claiming that she released her federal claims and that her state claim was simply limited to a PHRC investigation.' Because the Court finds that the handwritten provision lacks clarity, and that Plaintiff's interpretation of the provision is reasonable, the Court cannot say that Plaintiff knew or should have known that she was not preserving her right to sue based on the claims that she made in the

PHRC complaint." (citation omitted)).  Nevertheless, given that Jackson attests he did not in fact know that these claims were released, the Court finds that this factor weighs only slightly in favor of a finding of voluntariness.

Finally, the seventh *Coventry* factor is neutral because there is no evidence that Temple offered additional consideration for Jackson's broad waiver of employment claims.  *See Hoggard*, 2013 WL 3430885, at *5 ("The seventh factor is neutral.  Other than the $50,000 paid by Defendant to Plaintiff, the record is devoid of any indication that Defendant offered additional consideration for the execution of the C&R.  Also, there is no information before us that Defendant would not have agreed to the settlement of Plaintiff's workers' compensation claim without the agreement of Plaintiff to waive his right to bring the discrimination claims in state or federal court."); *Miller*, 2011 WL 5878338, at *5 (same).

In sum, five factors weigh strongly in favor of a finding of voluntariness; one factor weighs slightly in favor of a finding of voluntariness; and one factor is neutral.

As mentioned above, some courts look beyond the *Coventry* factors and also consider whether there is evidence of fraud or undue influence, and whether enforcement of a release agreement would be against the public interest.  Here, resolution of both issues suggests Jackson's waiver was knowing and voluntary.  First, Jackson has put forth no evidence of undue influence or fraud.  To the contrary, during the hearing before Judge Callahan, Jackson testified that he had not been forced or coerced into signing the agreements.  (D. Ex. 30 at 16:9–11.)  *See Cuchara*, 129 F. App'x at 731 (finding no evidence of undue influence and emphasizing that "[u]nder Pennsylvania law, absent a threat of actual bodily harm, there can be no claim of duress where the contracting party is free to consult with counsel . . . .  Because [the plaintiff] has not alleged any threats of bodily harm by [his employer] he cannot prove duress under these facts").

Second, Jackson argues that the public interest weighs against enforcement of the agreements in this case because the public has a strong interest in prohibiting employment discrimination.  But that interest is protected by the Court's consideration of the "totality of the circumstances."  *See Coventry*, 856 F.2d at 522–23 (employing the "totality of the circumstances" test to account for the "strong policy concerns to eradicate discrimination in employment").  Having found that those factors weigh almost entirely in favor of a finding of voluntariness, enforcement of the waiver in this case would not be against the public interest.  *See Hoggard*, 2013 WL 3430885, at *5 ("[T]here is no evidence that enforcement of the [release agreement] would be against the public interest.").

* * *

The "totality of the circumstances" strongly suggests that Jackson knowingly and voluntarily released his ADA and state law claims when he signed the Release and the ANSR.  Because a reasonable jury could not find otherwise, summary judgment is granted in favor of Temple as to Counts I, III, V, VI, and VII.[4]  The Court cannot, however, grant summary judgment as to Jackson's ADEA claim in Count II because, as Temple concedes, the Release and ANSR do not comply with the requirements of the Older Workers Benefit Protection Act.  *See Long*, 105 F.3d at 1539 (holding that the Older Workers Benefit Protection Act supersedes *Cirillo* with respect to release of ADEA claims).

### B.    *ADEA Claim*

That leaves Jackson's ADEA claim in Count II.  The Court applies the *McDonnell Douglas* burden shifting framework to age discrimination claims brought under a pretext theory.

---

[4] The Court has already granted summary judgment as to Count IV.  *See supra* n.1.  In the alternative, summary judgment on Count IV is also appropriate because Jackson knowingly and voluntarily released his Title VII claims for the reasons stated above.

Under that framework, Jackson must put forth evidence of a prima facie case of age discrimination by showing that: (1) he is over 40 years old, (2) qualified for the position in question, (3) suffered an adverse employment action, and (4) was replaced by a sufficiently younger person to permit an inference of age discrimination. *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 136 (3d Cir. 1997). The burden then shifts to Temple to "articulat[e] a legitimate, nondiscriminatory reason for the adverse employment action," *id.*, at which point Jackson must put forth evidence that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination," *Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410–11 (3d Cir. 1999). To demonstrate pretext, a plaintiff must point "'to some evidence, direct or circumstantial, from which a factfinder would reasonably either: (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Id.* at 412–13 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994)). Throughout this back and forth, Jackson maintains the ultimate burden of proving "that age was the 'but-for' cause of [Temple's] adverse decision." *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167, 176 (2009).

Here, Jackson argues that Temple discriminated against him on the basis of age when it denied him the position of Steam Plant Engineer.[5] (Doc. No. 39 at 25.) He then identifies three times when he was rejected for that position. (*Id.*) Jackson has stated a prima facie case as to only one of these instances. First, Jackson claims Temple offered him the Steam Plant Engineer position in 2017 "only to rescind the offer and give the job to a younger employee." (*Id.* at 24.)

---

[5] The record shows that after Jackson was fired from the Roving Engineer II position, he was replaced with Michael Coghlan, who was 40 years old. (Doc. No. 40 at ¶ 31.) Jackson does not, however, argue that his termination was the result of age discrimination, and instead focuses on his applications to the Steam Plant Engineer position. Accordingly, the Court does not consider whether Jackson was fired because of his age.

Jackson put forth no evidence that he exhausted this claim before the EEOC, and it is clearly outside the statute of limitations for doing so.  *See* 29 U.S.C. § 626(d) ("No civil action may be commenced by an individual under this section until 60 days after a charge alleging unlawful discrimination has been filed with the Equal Employment Opportunity Commission.  Such a charge shall be filed . . . within 300 days after the alleged unlawful practice occurred . . . ."); *Liszewski v. Moyer Packing Co.*, 252 F. App'x 449, 451 (3d Cir. 2007) ("[T]he charge-filing clock began running on June 17, 2004, and Sedlack's May 26, 2005 charge was filed some 40 days outside the statutory allowance."); *see also Balis v. Realtyline*, Civ. A. No. 08-3456 (SRC), 2009 WL 799277, at *4 (D.N.J. Mar. 25, 2009) ("The burden of proof of compliance with the statutory [exhaustion] requirements remains squarely upon Plaintiff.").  Moreover, Jackson's testimony—the only evidence in the record about this position—suggests that the position was ultimately given to a man named Bill Schweitzer.  (D. Ex. 1 at 54:21–55:3; *id.* at 58:10–59:7.)  There is no evidence in the record of Schweitzer's age, other than Jackson's testimony that Schweitzer is more than 40 years old.  (*Id.* at 55:7–11 ("Q: Do you know if Mr. Schweitzer is over 40?  A: Yes.  Q: He is, right?  A: Yes.").)  Without more, Jackson cannot show that the position was given to a "sufficiently younger" individual.

Second, Jackson asserts that he filled out an online application for the Steam Plant Engineer position in 2018 while out on workers' compensation and spoke with Johnston about the position, but Johnston "never got back to him."  (Doc. No. 39 at 24.)  It is unclear, however, who ultimately filled the position and whether that individual was younger than Jackson.[6]  *See*

---

[6] Indeed, other than Jackson's limited testimony that he completed an online application and spoke to Johnston while out on leave, there is no evidence in the record about the 2018 opening or Jackson's application for it.  There is some suggestion that this was not a separate application, but rather, the conversation with Johnston and application were done in connection with the job opening in November 2018, which the Court discusses next.  (*See* Doc. No. 43 at ¶ 36.)

*Ryder*, 128 F.3d at 136 (explaining that to make out a prima facie case, the plaintiff must put forth evidence showing that the position was given to "a sufficiently younger person to permit an inference of age discrimination"); *Sempier v. Johnson & Higgins*, 45 F.3d 724, 729 (3d Cir. 1995) ("To complete his prima facie case" the plaintiff "may point to a sufficient age difference between himself and his replacement such that a fact-finder can reasonably conclude that the employment decision was made on the basis of age. . . .  Different courts have held, for instance, that a five year difference can be sufficient, but that a one year difference cannot." (citations omitted)).

That leaves Jackson's application at the end of November 2018, after he was fired from the Roving Engineer II position.  (Doc. No. 39 at 24 ("He then applied a third time after Defendant terminated him.").)  This time, the position was given to man named Brandon Faison. (D. Ex. 1 at 56:17–18.)  Again, Jackson provides no evidence or argument about Faison's exact age.  Nevertheless, the Court's independent review of the record uncovered evidence that Faison was "half [Jackson's] age" when he was hired, which the Court interprets as meaning Faison was around 30 years old.  (*Id.* at 56:10–14; *see also id.* at 57:20–58:4.)  Assuming this is sufficient to state a prima facie case, the burden shifts to Temple to put forth a legitimate, nondiscriminatory reason for hiring Faison over Jackson.  Here, Temple asserts three such reasons:  (1) Faison was hired for his "knowledge of steam plants, his performance on the Steam Plant Questionnaire, and his willingness to work off shifts"; (2) Jackson's bid for the position was untimely; and (3) Jackson had recently been terminated for violations of Temple's Rules of Conduct.  (Doc. No. 37 at 29–31.)

Jackson does not challenge the truth of Temple's reasons or argue that they were fabricated.  *See Fuentes*, 32 F.3d at 764 ("[T]he plaintiff's evidence rebutting the employer's

proffered legitimate reasons must allow a factfinder reasonably to infer that *each* of the employer's proffered nondiscriminatory reasons was either a *post hoc* fabrication or otherwise did not actually motivate the employment action (that is, the proffered reason is a pretext).");  *see also Sempier*, 45 F.3d at 731 ("[T]he record is examined for evidence of inconsistencies or anomalies that could support an inference that the employer did not act for its stated reasons."). Instead, he argues that other evidence in the record supports a finding that age discrimination was "more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.

Jackson asserts that "he was *disqualified* prior to ever applying" for the steam plant position and although he was interviewed, "that interview was a sham."  (Doc. No. 39 at 22.) Specifically, Ounan, Jackson's previous second level supervisor, told Johnston that Jackson was not qualified for the steam plant position even though Jackson was found to be qualified in 2017 (*see* D. Ex. 21 at 38:13–19, 39:13–24), and when Johnston first told Ounan that Jackson intended to apply for the position, Ounan responded, "The short answer is absolutely not"  (*see* Doc. No. 40-15 at 2).  Notably, neither assertion relates to Jackson's age.  *See Connolly v. Pepsi Bottling Grp., LLC*, 347 F. App'x 757, 760–61 (3d Cir. 2009) ("Plaintiff claims the District Court failed to accord the comments made by Dillon and Sarneso . . . sufficient weight.  As the District Court recognized, Dillon and Sarneso's comments do not suggest potential age-related bias . . . ."); *Sosky v. Int'l Mill Serv., Inc.*, No. CIV A. 94-2833, 1996 WL 32139, at *8 (E.D. Pa.; Jan. 25, 1996) ("[T]his Court concludes that the various 'agist' comments," many of which are "undisputably" not agist, "are not only too stray and too remote from the decision to eliminate plaintiff's position as to constitute direct evidence of age discrimination, they are also too stray and too remote from the decision to support a reasonable indirect inference of age

discrimination.").  Moreover, there is no evidence that Ounan played any role in the hiring process for Steam Plant Engineer.  To the contrary, the interview evaluation reports for Faison show that he was interviewed by William Schweizer and John Zambito, not Ounan, and that Schweizer, and two other individuals (Luis Gonzalez, and Joe Monahan) requested HR affirmative action authorization as to the candidate list, with Faison listed as the top candidate. (D. Ex. 25 at TEMPLE001947, 1953–54.)  *See Ezold v. Wolf, Block, Schorr and Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of the decision.").

As alternative evidence of pretext, Jackson references the three times that he applied for the Steam Plant Engineer position, arguing that each time, "Defendant gave the position that Plaintiff applied for to someone substantially younger," and ultimately filled Jackson's Roving Engineer II position with "someone substantially younger."  (Doc. No. 39 at 22, 24–25.)  But apart from Temple's decision to hire Faison, Jackson's arguments are not supported by the record.  As discussed above, Jackson has not shown that the Steam Plant Engineer position was filled with someone "substantially younger" the first two times that he applied.  And although the Roving Engineer II position was filled with someone roughly 20 years younger than Jackson, there is no evidence that that individual was chosen over Jackson.  To the contrary, Jackson was offered the Roving Engineer II position in August and November 2018 but declined both offers. Given this, the fact that Temple later filled the position with someone younger than Jackson is not evidence of age discrimination against Jackson.

In short, Jackson's only evidence of pretext is that Faison is younger than he is.  (*Cf.* D. Ex. 1 at 57:20–58:4 ("Q: So I just want to be clear . . . .  With regards to the age claim, your

evidence of age discrimination is that they gave the job to someone younger than you—

A: That's correct.  Q: —period?  No other evidence?  A: No."); *id.* at 63:6–14 ("Q: [I]s there

anything else that you can tell me about whether there was someone younger than you who was

treated better than you?  A: No.").)  Without more, Jackson cannot satisfy his burden of

demonstrating Temple's legitimate, nondiscriminatory reasons for hiring Faison instead of

Jackson are pretext for age discrimination.

## V.     CONCLUSION

For the reasons discussed above, summary judgment is granted as to Temple on all

claims.  An appropriate Order follows.